## Ashley v. Dalton.

[81 South. 488, Division B. No. 20656.]

1. Breach of Marriage Promise. *Defenses. Marriage of promisor at the time of promise. Knowledge of promise.*

    The fact that the promisor was already married at the time of making the promises furnishes no defense to an action for a breach of promise, where this fact was unknown to the promisee.

2. Breach of Promise of Maariage. *Evidence. Admissibility.*

    In a breach of promise suit it was not error to admit evidence as to the amount of property owned by the defendant, as showing his wealth and standing, nor was it error to permit plaintiff's counsel to ask defendant whether he had bought Liberty Bonds, because this was merely to show the character of property that the defendant may have had and to discover whether he had other property than that mentioned.

Appeal from the circuit court of Copiah county.
Hon. D. M. Miller, Judge.

Suit by S. M. Dalton against J. W. Ashley. From a judgment for plaintiff, defendant appeals.

The facts are fully stated in the opinion of the court.

*R. N. Miller,* for appellant.

The court gravely erred in giving the fifth, sixth, seventh and eighth instructions given the jury. Instructions must be based on evidence. Not one particle of anxiety or distress of mind was shown or testito. There was nothing in the evidence to justify punitive damages; nothing whatever. Here was a woman old and foxy; had been through the marriage ceremony twice; never saw Ashley but two times in her life; Ashley never was in Laurel but one time, before this suit was brought and that was before she got the divorce in August, 1916, Ashley's only visit being in December, 1915. She was told by Carroll, Ashley was married. She admits this.

Plaintiff lived in Laurel only eighty miles from Hazelhurst with mails, telegraphs and telephones from these places; numbers of Hazelhurst people in Laurel named in the record she knew—and yet she tells us she remained in ignorance of Ashley's being a married man from December, 1915, to "the fall of 1916" just after her divorce in August, 1916, and writing numerous letters after that to Ashley and getting letters from and no hint of the disclosure made by Carrol of Ashley being married in the letters.

The evidence for defendant by Boutwell, sheriff of Jones County; by Webber Wilson, a practicing lawyer and county attorney for Jones County; D. A. Boutwell, a lawyer and justice of the peace of Laurel (a city of 15000); C. L. Ates, a merchant; A. K. Owin, a merchant; T. M. Martin and S. C. Carroll, livery men, all these men lived in Laurel—had known Mrs. Dalton well for years, knew her reputation as a witness—all testified her reputation was bad and would not believe her on oath. All these men are among Laurel's best citezens—wholly disinterested and plaintiff had here her attorney, Mr. Welch, who lives in Laurel, and she offered no counter-proof and did not go back on the stand to dispute anything these witnesses stated.

This is significant in view of the fact that the sheriff, Mr. Boutwell, testified that immediately after she first saw Ashley in December, 1915, and plaintiff told him she "had found out all about old Ashley— that he was a rich old guy and I'm going to trim him up, and get some of that money." Thus the plot "to trim him up" opened at the first interview with Ashley. See 118 et seq., record.

D. A. Boutwell testified about the same time plaintiff told him she knew Ashley was married; that he was rich and she was "laying for him" to get some money out of him.

T. M. Martin testified he was with Ashley when he first saw plaintiff and they were in a buggy and stop-

ped at her store a moment and she came out and asked Ashley when he was going home, and he told her he had to go very soon, that he had that morning gotten a letter from his wife, etc.

Mrs. S. C. Carroll testified soon after Ashley left there in December, 1915, eight months or more before she got her divorce—that she knew Ashley was married —she told him, Carroll, she knew it and she joked about getting money out of him. Carroll also told as she admitted that Ashley was married. In her evidence she would not fix that date. Said it was after her divorce, she believed. Now Carrol fixes this date on page 137, record, as soon after Ashley left there in December, 1915, long before her divorce from Dalton.

This plaintiff never returned to the stand to deny any of these damaging statements and the overwhelming evidence for the defendant was ignored by court and jury with the burthen of proof on her, and the jury told they might inflict punitive damages. Was ever such a judicial farce enacted before? For all these reasons our motion to exclude all plaintiff's evidence was bound to have been sustained unless the jury are judges of all the law and fact in this state.

There is one point now to which I call the court's attention that is bound to settle the question of plaintiff's right ever to recover in this case and which shows why we ought to have a clean judgment here. That is this: Mrs. Dalton admits that she was legally married to one Allison first, and had a child by him. That he left, but she nowhere states any inquiry that Allison was not heard from by others or any like things—but states she married Dalton because "his (Allison's) mother wrote me he was dead." "I could not swear he is dead—I only have his mother's word for it." No date of the mother's communication is given whether before or after she married Dalton, she stated at the outset of her cross-examination on page 95, record, "I am no spring chicken, I'm forty-four years old." This

119 Miss.]               Brief for appellant.

was in 1918 at the trial when she said she was forty-four years old. She states on same page of record when asked how old she was when she married Allison? ''I was twenty-seven years old.'' This would make her birth in 1874—twenty-seven added to 1874 would make her married to Allison in 1901. She lived with Allison years and then married Dalton. At the time she was testifying in 1918 she says at top of page 69 and on page 88 that Allison had then been absent twelve years.

So it is impossible that Allison was absent seven years after he left her. She lived with Dalton ten years before she left him in 1914 and filed her suit for divorce in 1915. This would fix her marriage to Dalton about 1904 so we have it from her she married Allison about 1901—married Dalton in 1904 and quit him in 1914, and was divorced from Dalton in 1916. How can it be said then that she was not married to Allison when this suit was brought and tried.

Allison simply got enough and left about 1903 or 1904, and in 1904, she married Dalton; a very significant fact is that she had insurance on Allison's life—poor and needy and never collected it. She says this was because Mr. Halsel, a lawyer, lost her policy. She did not wait the seven years fixed by statute as making presumption of death—but married Dalton in two years after Allison left. She does not give the date at which she says Allison's mother wrote her he was dead.

There is therefore no presumption of death of Allison that can be invoked here. Proof by her that she was the wife of Allison and no death or divorce being proven, she is now the legal wife of Allison as Dalton set up in her divorce suit, and her marriage to Dalton was void and she is not the lawful wife of Allison who is presumed, in absence of proof, to be alive. She there is asked how she knew Allison was dead—she says ''because his mother wrote me he was dead.'' Another answer just after, ''No, sir, I wish I did know.''

Q. If he is living, he's your husband? A. I suppose so, I haven't been divorced.''

It is perfectly clear that she is now Allison's legal wife and she ·could not herself make a valid contract to marry Ashley or any one else and this case for this reason ought to be reversed with judgment for Ashley.

For a dozen or more reasons by which it appears Ashley was deliberately mobbed—under the pretense of a trial, it ought to be reversed. It ought to be reversed for misdirection of the jury in plaintiff's charges and particularly plaintiff's second instruction on page 11, record. This charge is directly on the weight of evidence. Also the seventh instruction for plaintiff is without anything in declaration to base it upon. No deceit, I repeat, was ever charged. All the letters offered dated before Mrs. Dalton's divorce in August, 1916, were improperly admitted. None of the letters of any date show a promise to marry. Plaintiff won her case utterly on the prejudices and sentiment of the jury and on this illegal evidence. The overwhelming weight of all the evidence shows plaintiff failed to make out her case and did not carry the burden of proof.

For all these things, the case ought to be reversed but because she is yet the wife of Allison, Ashley ought to ⌐ave judgment here.

*Robert Powell* and *Robert Mayes,* for appellant.

We learned as an elementary principle in law that the maxim: *Ex Maleficio non ortur contractus; et, in pariter delicto, portior est conditio defendentis''* holds good, and in this case both alike were depraved, and the defendant is in the better condition. We repeat that the facts on which it is based are one continuity; its inception was in wrong and its ending can give no right to either party.

We do not think that counsel for appellee can produce any case where the facts are like this and where

the court has upheld the right of a partaker in the wrong to recover on a suit of this nature. In 4 R. C. L., page 145, paragraph 4, it is stated that: "Any promise of marriage made by or to a person who, to the knowledge of the parties, has a husband or wife living, is absolutely void in its inception and is ineffectual to give rise to an action, although such promise is not to be performed until after the death of the promisor's or promisee's husband or wife. Likewise, such a promise is void when made by a married person in expectation of a divorce by force of a pending suit, or by one already divorced if he is prohibited from re-marrying in the lifetime of his divorced wife. Even if the promisee be ignorant of the fact that the promisor is married, the latter is not liable if the former has knowledge of such facts as would lead an ordinarily prudent person to believe him to be married. The reason for holding contracts based on such promises as void is that they are opposed to morality and public policy, for only in the most corrupt condition of society and public policy, could such agreements be tolerated as lawful. They are in themselves a violation of marital duty and the persons who make them are morally unfaithful to the marriage tie."

We think that we could find no more apt language condemnatory of this suit than is found in the quotation from the authority above cited. Here is Mrs. Dalton bringing a suit for a breach of promise of marriage, averring in her declaration that she was married when she met the defendant and that she was corruptly induced by him to file a bill for divorce against her then living husband, in order that she might marry this defendant, and in the same declaration she states that her sole reason for waiting to do so was because Mr. Ashley had represented to her that he was wealthy, and she was after the money. It cannot be that out of this corrupt conspiracy, if we may use the term, that she can proceed to obtain her divorce from her then living husband, under this corrupt agreement,

an agreement which violates public policy and is shocking to common decency, and in pursuance of her purpose to get rid of her then living husband in order to marry this man, can convert this debasing and corrupt undertaking into one of purity and innocence just as soon as she does get her divorce, and in pursuit of this purpose obtain any standing in court on a breach of promise suit against the man with whom she conspired when she was a wife.

In this case, the court is called on to settle important principles of law—principles which will reach out and affect the marital relation when this case shall be forgotten. We are not here upholding the conduct of Mr. Ashley which may have been reprehensible, and it may be unfortunate that in settling the important principles involved here, that he is to escape with some light penalty for his silly course of conduct but it is far better that he be lost sight of than that this court should give its sanction to conduct such as Mrs. Dalton has been guilty of. In the case of *Noice* v. *Brown,* 20 Am. Rep. 388, cited in Am. & Eng. Ann. Cases, it is held as follows: "A promise of marriage by a married man in expectation of a divorce from his. wife by force of a pending suit is void. Likewise, a promise made while, to the knowledge of the parties the woman is married, is void. *Smith* v. *Hall,* 69 Conn. 664; *Drennan* v. *Douglass,* 102 Ill. 341, 40 Am. Rep. 595; *Eve* v. *Rogers,* 12 Ind. App. 623, 40 N. E. 25; *Leaman* v. *Thompson,* 43 Wash. 581, 86 Pac. 926.

Such contracts are opposed to morality and public policy. *Noice* v. *Brown,* 38 N. J. L. 228, 20 Am. Rep. 388; *Leaman* v. *Thompson, supra; Spiers* v. *Hunt* (1908), L. K. B. (Eng.) 720, quoting from *Noice* v. *Brown, supra,* as follows: "It is wholly fallacious to suppose that a contract is not illegitimate if the act agreed to be done would not be illegal at the time of its contemplated performance. Such is not the law. A contract it totally void, if when it is made, it is

opposed to morality or public policy. The institution of marriage is the first act of civilization, and the protection of the married state against all molestation or disturbance is a part of the policy of every people possessed of morals and laws. But this relationship, in order to execute the purpose for which it is established, requires the undivided devotion of each of the parties to it to the other, and the consequence is that it is invaded and impaired by any thing which has a tendency to alienate such devotion.''

This transaction began in corruption on the part of the plaintiff. She had wrapped herself with the raiment of impurity and she cannot cast it aside and assume a raiment of purity from the date she receives her divorce, for the continuation of her journey is but a fulfillment of the corrupt purpose she had in the beginning. We repeat, that the appellee and appellant both alike are depraved and the defendant is in the better condition. We do not think counsel will produce any case in conflict with our contentions.

In volume 4 R. C. L., page 146, it is stated that a man, though married, may not escape liability for damages by his promise to marry an unmarried woman, if the latter enters into the contract with him in ignorance of the fact that he has a living wife, since the failure to hold this would place a premium on villainy. But this authority does not help appellee. The liability for damage in such case is made to depend upon the fact that the promise made was to an unmarried woman, an innocent woman, and not a woman who had debased herself by corruptly agreeing to obtain a divorce from her living husband; not a woman who is more guilty than the man whom she uses. The court gives its aid to the innocent, but does not help to effectuate villainy, and we contend that if Mrs. Dalton is permitted to recover in this case, the effect will be to aid her in a corrupt undertaking. She may not have known in the beginning of the affair that Mr. Ashley was married, but she knew

she was. An illuminating case on this subject from our own reports is that of the *Western Union Telegraph Company* v. *McLaurin,* 66 So. 739. Among other things held in that case, the court says: "The test of whether or not a demand connected with an illegal transaction is capable of being enforced by law is whether or not the plaintiff requires the aid of the illegal transaction to establish his case. *Swann* v. *Scott,* 11 S. & R. 164; *Thomas* v. *Grady,* 10 Pa. 170; *Scott* v. *Duffy,* 14 Pa. 20.

If a plaintiff cannot open his case without showing that he has broken the law, the court will not aid him. It has been said that the objection may often sound very ill in the mouth of the defendant, but it is not for his sake the objection is allowed; it is founded on general principles of policy which he shall have the advantage of, contrary to the real justice between the parties. The principles of public policy are that no court will lend its aid to a party who grounds his action upon an immoral or illegal act."

Again, in column 2, page 740, 66th So., in this same case the court further says: "It may be thought that the maxim that the law will not relieve a party from the consequences of his own wrongdoing partakes more of a severity to the particular person singled out by the plaintiff for pursuit than it does of general justice. It may be right to punish him, but is it right to exempt from punishment others equally guilty? If strict justice as between individuals was all that is aimed at, we should be required to answer in the negative and we must therefore look further for the reason for this rule."

This court further states, on the same page: "Whoever, by his pleadings in any court of justice, avows that he has been engaged with others in an unlawful action or has concerted with them in an unlawful enterprise, and that in arranging for it or carrying it out, he has been unfairly treated by his associates or has suffered an injustice which they should redress, will

be met by the refusal of the court to look any further than his complaint, which it will at once order dismissed. The following reasons may be assigned for this action: (1) The discouragement of illegal transactions by distinctly apprising every person who engages in them that the risk that he incurs is not merely of being compelled to share with the others, the loss that may follow, for this, in many cases would be insignificant, and, in all cases, would be small in proportion to the size and formidable character of the combination. He is therefore given to understand that whoever takes part in an illegal transaction must do so under a responsibility only measured by the whole extent of the injury or loss; an understanding very well calculated to make men hesitate who, under a different rule, would be disposed to give full scope of evil inclinations. But (2) the state, from a consideration of its own pecuniary interests and of the interests of other litigants, may wisely refuse to assist in adjusting equities between persons who have been engaged in an unlawful action. The expense of administering justice is always a large item in the state's expenditures, and one which must be borne by the common contribution of the people. Where one has suffered from participation in an unlawful undertaking, what justice can there be in any demand on his part that the state shall supply courts and officers and incur expenses to idemnify him against a loss he has encountered through a disregard of its laws? Here the question is not merely one of what is right, as between himself and his associates, but what is best for the interest of the state. When that question is up for consideration, the fact is not to be overlooked that there are unavoidable difficulties and unnecessary evils connected with litigation, which multiply rapidly as the cases increase in number. Courts and juries, at the best, are but imperfect instruments for the accomplishment of justice; and the greater the volume of litigation, the less is the attention which any

particular case is likely to receive and the greater the probability that right may be overcome by artifice, or by a false and deceptive exposition of the facts. Trusty justice must follow after wrong with deliberate and measured tread; and every honest litigant, in seeking it, must be more or less impeded, when those who have no just claim on the consideration of the court are allowed to push their complaints before it. It is not necessary to look further for reasons in support of the rule to which attention has been directed.''

Applying the rule declared by this court in the above case, it necessitates, we contend a peremptory instruction in this case, and its reversal. The plaintiff bases her suit.on a corrupt agreement to obtain a divorce, made at the time when she was a married woman, as we have seen emphasized in the beginning of this brief. Not only is this suit based upon this, but instruction number nine, given for the plaintiff, emphasizes it still further. In this instruction, the court deliberately tells the jury that if ''they believe from the evidence that plaintiff and defendant enteded into a contract to be married before plaintiff obtained her · divorce and that this contract was renewed after she obtained it,' ''That they must find for the plaintiff. No such instruction as this, we contend, is or can be the law. This instruction tells the jury that they must overlook the corrupt beginning of plaintiff's contract and find for her if they believe that by virtue of this corrupt agreement on her part she obtained a divorce and after thus securing. it, by collusion with the defendant, he renewed and ratified a promise made to her under the corrupt beginning. This instruction is in the face of the law, as declared in the *McLaurin case, supra,* which states that whoever, by his pleadings in court, avows that he has been engaged in an unlawful transaction with others and has been unfairly treated therein, can obtain no aid of comfort or help from the court,

as the court will not lend its protection to suits of that kind, and such cases will be promptly dismissed.

Further in connection with the admission of improper evidence and examination, we wish to call attention to the fact that the court below permitted counsel for plaintiff in the court to ask Mr. Ashley numerous questions relative to the character of his property, whether it consisted of bonds, and if so, did he own any United States bonds. The court will take judicial notice of the fact that when this case was tried, in the fall of 1918, this country was aflame with patriotism and in the midst of a world-wide war. It is shown that Mr. Ashley was a man of some means and the court will judicially know that the United States was issuing its bonds and selling them to the citizens for the purpose of raising money to conduct its military operations. The court will judicially know, also that many demands were made upon the loyalty and patriotism of the people by this method and all the people, high and low, rich and poor, were responding to the call of the government and in some instances stripping themselves by patriotic subscriptions to the securities. It was thought to be an act of disloyalty not to respond to these calls. Counsel trying this case was fully aware of this state of the public mind, and in order to arouse sentiment against the defendant, brought out the fact that though he was a man of some means, he had not subscribed for liberty bonds. On page 87 of the record, it is shown that this character of examination was objected to and while the trial court apparently sustained this objection, the character of testimony that would go to the jury was highly prejudicial to Mr. Ashley, and when the counsel for Mr. Ashley said that the character of property was immaterial and should not be inquired into along this line, as it had never been done before, the court said: "Well, it is done this time." This we contend, was incompetent, immaterial, and irrelevant. The whole purpose should have been to

find out how much appellant was worth, and the character of the property was not necessary to be ascertained.

Again, we insist that the admission of the letters written to Mrs. Dalton before she obtained her divorce was wrong, under the rules of admissibility of evidence, and served no purpose except to subject Mr. Ashley to the scorn and ridicule of the jury. They were admitted, presumably to show the state of feeling which existed between them at this time, but the state of feeling before the divorce was granted is immaterial as evidence, and it was error for the court to permit the defendants to be prejudiced in the eyes of the jury in this manner.

We have found no case which holds that evidence of this character is admissible, and we have made diligent search for same. In the case of *Dougherty and wife* v. *Vanderpool*, 35 Miss. 165, this court held that it is error to admit evidence that would be of such character as would likely mislead the jury.

In addition to this we contend that the court erred in giving the eighth instruction to the jury, by which instruction the jury was told that they might consider, in estimating the damage for plaintiff, the anxiety of mind of the plaintiff, also the depth of her devotion to defendant. These are elements which are not only not sued for, but which are not shown to exist. This is not a case of blighting love's young dream. There was not a human heartbeat in the entire transaction. It was the arrow of mammon and not of Cupid that had pierced appellee's heart. This was a cold, deliberate, money transaction, and as such should be dealt with. In addition to this, by instructions five, six and seven, the jury are told that they might assess punitive damages. Our contention is that there isn't a fact in this case which warranted these instructions being given to the jury. The case in which exemplary damages may be awarded under the laws of this state are

well known, and while we do not dispute that punitive damages may be allowed in some circumstances, for a breach of promisee suit, we deny that any of the facts in this case warrant the awarding of punitive damages. In 4 R. C. L., page 158, it is held that: "In an action for a breach of promise of marriage, it is always competent, for the purpose of enhancing the damages, to prove the motives that actuated the defendant; that he entered into the contract and broke it with bad motives and a wicked heart."

This escapade is too silly to be treated seriously. There is nothing in this case except that a vain old man, feeling flattered at being noticed by the appellee, carried on a harmless flirtation with her for a little while. There is nothing to show that his motives were bad, or that he had a wicked heart. The acquaintance was picked up on the street, with no sponsor, by two more than middle aged persons of opposite sex; neither has been hurt and it is shocking to the conscience, in the light of this record, that a judgment of ten thousand dollars be permitted to stand.

In the case of *Clement* v. *Brown*, 56 N. W. 198, it is held that punitive damages should not be assessed where the plaintiff is disclosed by the record as being no better than the defendant. Surely the facts in this case place these parties on a perfect equality, as to character and conduct.

We respectfully and earnestly submit that if the court determines that we are wrong in every position that we have taken in this case so far, it is manifest that the verdict of the jury is excessive. It is true that the imposition or damages rests largely upon the discretion of the jury, but this record wholly fails to develop any damages done to Mrs. Dalton of a substantial nature. The result of this case shows that the jury was influenced by passion and prejudice, because there is a total absence of anything in the record showing any real damage. All the damage allowed by the jury is

punitive damage. The record shows that this old man is worth between fifty and sixty thousand dollars, maybe less, maybe more, and thus the jury's verdict takes from him between one-fifth and one-sixth of his entire fortune, and gives it to a woman whose standards of moral obligation of the marital relation could not be lower. She shows by the record that she is insensible to the marital tie, and treats it as lightly as do the pleasure seekers at Mardi Gras treat the vari-colored tissue ribbons and confetti in which they are frequently entangled.

We contend that there is no merit in this case and earnestly and respectfully insist, for the many reasons shown above, that it be reversed and dismissed; if we are wrong as to this, that the amount of the judgment be reduced to reasonable bounds.

*M. S. McNei* and *Welch & Street,* for appellee.

We will undertake to discuss this case and answer appellant's brief under the four general heads: First: The contract of marriage; Second: The admissibility of the evidence; Third: The instructions of the court; Fourth: Damages.

Contract of Marriage. It will be observed from a reading of the declaration that the question of liability was not predicated upon anything which occurred before the divorce was granted Mrs. Dalton, but that plaintiff's whole case was based upon a marriage contract which was entered into after she had been divorced from her husband, Mr. Dalton.

What is said of the declaration can also be said of the instructions granted the plaintiff in this case. Each and every instruction for plaintiff proceeded upon the idea that the contract sued upon was a contract entered into, not before the divorce was granted, but after the divorce was granted.

After a careful investigation of the authorities we are convinced that the rule laid down in *corpus juris* is the rule adopted in every state where this queston has been before the courts.

The fact that the promisor was already married at the time of making the promise furnishes no defense to an action for a breach of the promise, where this fact was unknown to the promisee.'' (9 C. J., Page 325).

*Carter* v. *Rinker,* 174 Fed. 882; *Davis* v. *Pryor,* 3 Ind. T. 396; *Kelley* v. *Riley,* 106 Mass. 339, 8 Am. Rep. 336; *Blatmacher* v. *Saal,* 29 Barb. 22, 7 Abb. Pr. 409; *Kerns* v. *Hagenbuchle,* 60 N. Y. Super., 222, 17 N. Y. S. 367; *Waddell* v. *Wallace,* 32 Okla. 140, 121 Pac. 245; *Stevenson* v. *Pettis,* 12 Phila. 468; *Coover* v. *Davenport,* 1 Heisk. 368, 2 Am. Rep. 706; *Johnson* v. *Ill,* 114 Tenn. 114, 85 S. W. 79; 108 Am. State Rep. 891; *Pollock* v. *Sullivan,* 63 Vt. 507, 38 Am. Rep. 702; *Wild* v. *Harris,* 7. C. B. 999; 62 E. C. L. 999; 137 Reprint, 395; *Daniel* v. *Bowles,* 2 C. & P. 553; 12 E. C. L. 728; *Millward* v. *Littlewood,* 5 Exch. 775; 1 Eng. L. & Eq. 408; 115 Reprint, 339; *Waddell* v. *Wallace,* 32 Okla. 140, 121 Pac. 245; Ann. cases 1914A, 692.

We take it that the authorities are uniform on this proposition and that the further citation of authorities is unnecessary.

This brings us to a consideration of the question as to whether or not the conversation between the parties after the divorce as related by appellee constitutes a valid binding contract of marriage, which the appellant denies in his brief. Analyzing the testimony of appellee on this subject, *supra,* he promised to make her a good husband; he told her he was a good provider; he informed her of his beautiful home in the country; he left it to her choice as to whether or not after they married she would live in Hazelhurst or in the country. She accepted by expressing the wish that she would rather live in the country. He continued the conversation by saying that she was a good woman, and he

was going to give her plenty of good stock and plenty of
nice things around her home, and she would be required
to do nothing except ride over the farm.  We submit
that this testimony proves an expressed, mutual prom-
ise and agreement to marry.  Under the law no formal
words were necessary, as will be seen from the follow-
ing authority.

"No formal words are necessary to constitute a con-
tract to marry, nor is it necessary that there should be
an expressed promise in direct terms, but such a prom-
ise may be inferred from or established by the facts and
circumstances, although it is unspoken.  All that is
necessary is that the parties shall understand that it
is their intention to marry."  (9 C. J. 325.)  A very
similar case to the one at bar will be found in the case
of *Leaman* v. *Thompson,* 43 Wash. 579; *Connolly* v.
*Bollinger,* 67 W. Va. 30, 67 S. F. 71.  Stating the facts
more strongly for the appellant it can only be said that
the courtship began previous to the divorce and the
engagement or contract made after the divorce.  But
even granting that there was an engagement before the
divorce and that this engagement was renewed after
the divorce was granted, this would not render the
second contract void on the grounds of public policy or
for any other reason; and in every instance where this
question has been decided by any court in the United
States it has been decided adversely to the contention
of counsel for appellant.

"A renewal of the promise after removal of the
disability will support an action for a breach.  A
promise made before the bonds of a former union have
been dissolved does not render invalid a second promise
made after divorce."  (9 C. J. 324).  Citing: *Leaman* v.
*Thompson,* 43 Wash. 579, 86 Pac. 926; *Morgan* v.
*Meunch* (Iowa), 156 N. W. 819; *McKee* v. *Mouser,* 108
Iowa, 61, 71 N. W., 835; *Royle* v. *Smith,* 40 Iowa, 615.

A review of the authorities convinces us that it is
universally held, without a single exception, so far as

we are able to find, that a marriage promise made before the bonds of the former union have been dissolved does not render invalid the second promise after divorce.

"A marriage promise made by a man before the bonds of a former union have been dissolved does not render invalid a second promise after divorce." (Breach of Promise Marriage, Cent. Dig. Sec. 3). *Morgan* v. *Meunch,* 156 N. W. 819, citing *Royal* v. *Smith,* 40 Iowa, 615; *McKee* v. *Mouser* 131, Iowa, 203, 198 N. W. 228; *Rime* v. *Rather,* 108 Iowa, 61.

This brings us to a consideration of the next proposition in this case.

Admissibility of the evidence. Counsel in their brief insist that the letters of appellant offered in the court below, written before the divorce was granted, were incompetent, irrelevant and prejudicial and should have been excluded by the court, but offer no authority in support of their position. On this proposition we insist that they are in error. All facts offered in evidence in this character of a suit throwing light upon the relation of the parties is competent, not for the purpose of providing a contract before the divorce was granted, but for the purpose of furnishing to the jury a complete history of the case; the relation of the parties and the interest and motive of the promisor.

In the case of *Morgan* v. *Meunch, supra,* this identical question was raised, and the court said: "It is thought by appellant that evidence in relation to the trip to Yellowstone Park and the relation between the plaintiff and the defendant and their conversations prior to the divorce should have been excluded and the jury instructed to disregard it because not competent, but we think that even if an action may not be based upon a promise of marriage before a divorce, plaintiff knowing that fact, still the evidence was proper as showing the history of the case and the relation between the parties."

119 Miss.—44

Citing in support of this proposition the case of *Lauer* v. *Banning,* 140, Iowa, 319; 118 N. W. 446.

The only other questions of evidence touched upon by counsel for appellant are the questions propounded by the examiner with reference to whether or not the defendant owned in addition to his other property any United States Bonds. It will be noted that the defendant was questioned with reference to his wealth but counsel for the plaintiff in the court below was unable to ascertain from him while upon the witness stand the aggregate amount of his wealth, the defendant answering: "I couldn't tell exactly Mr. McNeil."

The rule governing the introduction of this character of evidence has been stated as follows: "Defendant's financial condition and social standing being matters proper for consideration in estimating the damages, it follows that evidence tending to throw light on these matters is admissible; and indeed, it has been considered that defendant's financial standing should not be considered in the absence of evidence thereof. Defendant's reputation for wealth may accordingly be shown; and, according to some authorities, evidence of wealth is confined to general reputation, and it is not permissible to go into the particulars of defendant's possessions, but other cases hold such evidence admissible. The evidence should be confined to the time of the breach, or the time during which defendant might reasonably have been expected to perform the promise." (9 C. J. 357). *Vaughn* v. *Smith* 177, Ind. 11, 96, N. E. 594. Ann. Cases, 1914C, 1092. *Virling* v. *Bender,* 112 Iowa, 337, 85 N. W. 621. *Rime* v. *Rater,* 108 Iowa, 61, 78 N. W. 835.

The Instructions of the Court. We now come to the next proposition to be considered in this brief, that is, the instructions of the court given the appellee and assigned as error by the appellant. Appellant complains that the fifth, sixth, eighth and ninth instructions given for the plaintiff were improper and should not have been

given; but the only objection urged to the fifth, sixth and seventh instructions is that they authorize the jury to inflict punitive damages. We will discuss these instructions and undertake to answer appellant's criticism under the general head of damages in this brief, and will therefore devote our attention here to the eighth and ninth instructions complained of by the appellant. Instruction No. 8 reads as follows: ''If the jury should find for the plaintiff, then in estimating the damages it is proper for the jury to consider anxiety of mind of the plaintiff produced by the breach of the contract; advantages which might have accrued to the plaintiff produced by the breach of the contract; advantages which might have accrued to the plaintiff from the marriage; the depth of the plaintiff's devotion to the defendant; defendant's conduct and treatment of the plaintiff in his whole intercourse with her. It is also the duty of the jury to consider in such case the defendant's financial condition and social standing, and to award her such damages as would fully compensate her for the breach of the contract.''

The criticism offered to this instruction is that plaintiff received damages at the hands of the jury which were not alleged in the declaration. ''She does not ask in her declaration for damages for any anxiety of mind, or because of loss and suffering brought about on account of her devotion to the defendant. These are elements of damages which have not been sued for, and the court should not have told the jury that they were to be considered in estimating the amount of damages which the plaintiff sustained.''

An action for the breach of a contract of marriage, while it partakes of the nature of a tort, is not a tort. We find the form of this action well defined on page 335, C. J. 9.

''An action for a breach of promise is in form an action founded on contract and not in tort and is treated as an action for breach of contract, but the injury is

regarded as entirely personal, and the action, although in the form of one for breach of contract, is really one for an injury arising from the personal conduct of the defendant and affecting the personalty of the plaintiff.'' From this proposition it can be seen that the general rules which apply to suits on contracts do not apply to a breach of contract of this nature. A complete answer to the criticism offered by appellant in their brief is found on page 346 of the same authority.

''Plaintiff is not required to specify in her complaint, declaration or petition, those elements of damages which follow naturally on the breach of a promise to marry, and under a general allegation of damages she may recover not only an indemnity for a pecuniary loss and the disappointment of a reasonable expectation of an advantageous settlement in life, but also compensation for injury to feeling, affections and mortifications undergone.'' C. J. 9, 346.

''It will be found that the general rules applicable to actions of tort are applied rather than the rules which govern an action of tort, and certain damages are presumed without being specially alleged.''

*Kennedy* v. *Rodgers*, 2d Kan. A. 764, 44 Pac., 47. *Osmun* v. *Winters*, 25 Or., 260, 35 Pac. 250.

We especially direct the court's attention to the case of *Jacobs* v. *Stark*, 205 Ill. 334; 68 N. E. 537, holding that it was not necessary to the plaintiff's right to recovery that the particular circumstances of aggravation should be set out and giving the reasons therefor.

We come now to the consideration of the 9th instruction and the objections urged thereto. This instruction reads as follows: ''The court instructs the jury for the plaintiff that if you believe from the evidence that plaintiff and the defendant entered into a contract to be married before she obtained her divorce and that this contract was renewed and ratified after plaintiff obtained her divorce from her husband and at a time when plaintiff had no knowledge that the

defendant was a married man, then it is the sworn duty of the jury to find for the plaintiff.''

The main objection urged to this instruction is that if a contract was made before the divorce it was against public policy and did not become purged of its character as such contract¨by a renewal after the divorce was granted. This objection has already been answered in this brief, but an additional and complete answer to the objection is found in 9 C. J., page 325.

''A renewal of the same promise after removal of the disability will support an action for a breach.''

Citing, Leaman v. Thompson, 43 Was. 579, 6 Pac. 926. Morgan v. Meunch, 156 N. W. 819, McKee v. Mouser, 131 Iowa, 230, 108 N. W. 228; Rime v. Rater, 108 Iowa, 61, 78 N. W. 835; Royle v. Smith, 40 Iowa, 615.

We earnestly insist that the objections urged to these instructions are without merit and should not be considered by this court.

Damages. We come now to the consideration of the questions of damages in this case, and under this head we will undertake to discuss and answer the proposition urged by counsel for appellant in their brief, that this is a case in which an instruction for punitive damages should not have been given, and also the question as to whether or not the verdict in this case is excessive.

The same objections, under a very similar state of facts, were urged in the case of Morgan v. Meunch, supra, notwithstanding this, under the broad latitude given a jury in the trial of this character of case, the Supreme Court of the State of Iowa permitted a verdict of $16,000.00 to stand, and the defendant in that case was only shown to be worth between $40,000.00 and $50,000.00. 62 Tex. Civ. App. 34, 130, S. W., 871.. Waddell v. Wallace, 32 Okla., 140, Ann. Cases 1914A. 695, 1 Bishop on Marriage and Divorce, sec. 227. Sec. Ed. Hale on Damages, page 522, citing: Lawrence v. Cooke, 56, Me. 187, 96 Am. Dec. 443; Miller v. Rosier,

31 Mo. 475. See "Breach of Promise Marriage," Dec. Dig. (Key. No.), Secs. 25 and 26, Cent. Dig. Secs. 38 and 39.

The further reference we respectfully refer the court to 9th Corpus Juris, page 371 and 373., (9 C. J. 371, 9 C. J. 372).

In view of the rules laid down for the recovery of damages in suits of this nature; in view of the fact that the jury may consider the financial condition of the plaintiff, as well as that of the defendant; in view of the fact that the defendant in this case was worth sixty thousand dollars and perhaps more, and of the further fact that had the contract been consummated the plaintiff would have been brought from her humble home to a beautiful country home, can it be urged for a moment that a verdict for ten thousand dollars is excessive? Would she not be in a better position, viewing the question from a financial standpoint alone, if the marriage contract had been consummated and she had been carried to a delightful home, made the wife of a vice president of a bank, whose net worth was more than sixty-nine thousand dollars, than she would be in her present attitude, if the ten thousand dollars was paid her in damages as a result of the breach?

We insist that if this case was left to rest upon the question of actual damages alone the verdict of the jury should not be distributed (9 C. J. 382).

This brings us to the question of punitive damages, and whether or not the court erred in submitting this question to the jury. The rule governing the submission of punitive or exemplary damages to the jury has thus been stated:

"An action for breach of promise is an exception to the rule that exemplary or punitive damages should not be allowed in actions on contract, and with regard to the measure of damages it has always been classed with actions of tort. Accordingly, where, in the making of the contract or in the breach thereof, defendant has been

guilty of fraud or deceit, or has been actuated by evil motives, punitive or exemplary damages may be awarded." (9 C. J. 382.)

We earnestly submit that appellant was given a fair and impartial trial in this case before a jury of his home county, and the verdict should be affirmed.

*Teat & Teat,* for appellee.

A quotation from 4 R. C. L., page 143, an authority greatly relied upon by the appellant, shows how wide of the mark, the partisanship of the appellant in his brief has carried him, from the principles of law governing the rights of the aggrieved party in a case of this kind:

"Right in general.—An action for a marriage contract will lie at common law. The law generally takes the worldly view that marriage is a "value, but the one value of which may be estimated in money, and therefore, in a sense, marriage engagements are regarded as business transactions, entered into with a view, in part at least, to pecuniary advantage. The common law does not hesitate to award relief in damages for the breach of such contracts, and this right is accorded general recognition in modern practice." 4 R. C. L., page 143.

We shall pass along to another point made by the appellant wherein he complains that he should not be held in damages in this case because at the time of the first meeting the appellee had not obtained her divorce decree and that because he himself had a living wife. In support of his contention he quoted from the same volume 4 R. C. L., page 145, section 4. The appellant only quotes a part of the said paragraph. We will quote the latter part of the same paragraph:

"According to the courts in the United States a man, even though married and consequently incapacitated to execute a contract or promise of marriage to another, may not escape liability for damages occasioned by his promise to marry an unmarried woman, if the latter

enters into the contract with him in ignorance of the
fact that he has a living wife; since, as it has been
well said, the contrary rule would be offering a premium
on villainy.    The strict rule that a consideration to
support a promise is insufficient if its performance is
utterly and naturally impossible is met by the suggestion
that even if the future performance here is to be
treated as utterly impossible, yet the detriment or dis-
advantage which must necessarily result to the plaintiff
in relying for any time on the promise affords sufficient
consideration to support the defendant's contract.''    4
R. C. L., page 145, sec. 4.

An examination of the cases cited in the footnotes
to the above text shows them to be fully in support of
the rule therein announced.    Many of the cases therein
cited are also cited in the footnotes to the text found
in 9 Corpus Juris., pps. 320 to 330, frequently cited
in the brief of associate counsel herein.

We assert therefore that it is well settled law in the
courts of this country, that the appellee herein is fully
entitled in law to recover damages against the appellant.

Another point pressed by the appellant in his brief
is that the damages are excessive and that there is no
authority in law for the imposition of punitive damages.
While the 9th volume of Corpus Juris has been cited by
our associate, Mr. McNeil and constitute ample author-
ity in answer to the appellant's contentions, we will
however again cite from appellant's favorite authority,
4 R. C. L., page 157, paragraph 16. (4 R. L. C., page 157,
paragraph 16.)

It is very clear from all of the authorities that a
different rule obtains as to the measure of damages in
an action for breach of contract to marry than that
which governs in other cases.

The issue of fact having been settled by the verdict
of the jury and the plaintiff's right to recover having
thereby been established, the appellant in his brief, we
may fairly say practically concedes to Mrs. Dalton the

right to recover some damages. Now let us make a few figures, tested out under the rules applicable to the measure of damages in a case of this kind. It is practically conceded that Mr. Ashley was shown in evidence to be worth something like sixty thousand dollars. Also, if we can recall the record correctly he had two children. If by the consummation of this marriage, Mrs. Dalton should have become an heir at law with a child's part in the estate, her reasonable prospects would have been an heirship of one-third thereof, to-wit: twenty thousand dollars. The jury only rendered a verdict for ten thousand, thus showing that they were awarding Mrs. Dalton only half of the proven expectancy.

Thus we see that the jury's verdict, theoretically just, as it is regarded by our legal institutions, proves in this case to have been exceedingly reasonable and almost too lenient to afford a substance to this disappointed and humiliated woman who has been forced by the wrongful acts of the appellant and the charitable verdict of the jury to be remitted to the recovery of the small amount awarded her herein.

ETHRIDGE, J., delivered the opinion of the court.

The appellee filed a suit in the circuit court against the appellant for a breach of promise of marriage. The appellant was a man of some sixty years of age who had accumulated a modest fortune, and a married man for many years, and at the time of the trial of the cause below was still a married man. He lived at Hazelhurst in Copiah county, and the appellee lived at Laurel in Jones county. Appellant had occasion to go to Laurel on business. The parties first met on the streets of Laurel, whereupon the appellant, seeing the appellee, remarked, "Gee, whiz! Some man has a good-looking wife; who is she?" It seems that the appellee at that time was also a married woman, but

had a suit for divorce pending in the courts against her then husband. Appellant followed her to a store, where she was running a small business, made her acquaintance, and made display of the fact that he was a man of means, and represented himself as a widower, and proceeded to pay court to the appellee.

Both these people seem to have been birds of prey; the appellee preying for wealth and position, the appellant preying for beauty and pleasure. The sweet courtship proceeded apace, and a divorce was obtained by appellee in due course. If the matter had ended prior to the granting of the divorce to the appellee, this suit could not be maintained, but the appellant seems to have been too pleased with his adventure, and held out the glittering hues of hope to the delectable widow after the divorce was obtained. According to the appellee he told her after the divorce was granted that he was going to make her a good husband, and that he was a good provider, and "asked me would I rather live in Hazelhurst in town or in the country. He said he had a beautiful country home, and I told him I would rather live in the country, and he said, "I know you are a good woman, I can see that. I am going to give you plenty of good stock and plenty of nice things around your home, and all you will have to do is to ride over the fields in a buggy and look after the hands.' " He wrote her numerous letters, containing not only terms of endearment, but reports on his financial standing and business connections, which evidently were attractive to the grass widow. Finally some friend of the widow told her that the appellant was a married man and was making a fool of her. She seems not to have made any effort to find out whether he was married or not prior to that time, but took his word.

Appellant insists that inasmuch as he is already married he cannot be mulcted of his dollars for failure to marry again; that the promise was void and incapable

of fulfillment, and therefore that the verdict of the jury in the court below was wrong. In 9 Corpus Juris, 325, it is stated:

"The fact that the promisor was already married at the time of making the promises furnishes no defense to an action for a breach of promise, where this fact was unknown to the promisee."

A number of authorities were cited to sustain that statement, among which is the case of *Waddell* v. *Wallace,* 32 Okl. 140, 121 Pac. 245, Ann. Cas. 1914A, p. 692, which case holds, in accordance with the text above set out, that where a woman in good faith enters into a marriage contract with a man, and he fails to fulfill his promise, she may maintain an action for damages against him for breach of promise, notwithstanding the fact that he was married to another woman at the time the contract was made, if such fact was unknown to the woman at the time of the engagement, and that as elements of damages she was entitled to recover for mental anguish, mortification, humiliation, and loss of health resulting from such breach, in addition to actual pecuniary loss sustained thereby.

We think that the law so announced is sound, and accords with the weight of authority. The cases are collected in a note to this case in the volume of Annotated Cases above cited, at page 695, and also in the note to the case of *Wilson* v. *Carnley,* 14 Ann. Cas. at page 162.

We are not impressed with the merits of the other contentions presented by appellant, and we think the instructions, taken as a whole, present the law of the case fairly, and that there was no error in admission of evidence as to the amount of property owned by the appellant, showing his wealth and standing, nor was it error to permit plaintiff's counsel to ask the appellant whether he had bought Liberty Bonds, because this was merely to show the character of prop-

erty that appellant may have had, and to discover whether he had other property than that mentioned.

It would perhaps be useless .to offer suggestion or counsel to a man of the age of appellant, or to lay down any proposition that would carry caution to the mind of people of his age and class, especially when it comes from his junior in years if not in wisdom. Yet it might be proper to remind others of his type that he who would trip the light fantastic toe with the terpsichorean maid must contribute coin to the man who extracts mystic music from the violin strings, or, in other words, that pleasure must be paid for with the coin of the realm; and to remind them of the truth expressed by a minor poet when he said:

"When of 'dough' we get a batch,
The women make us toe the scratch,
And he who courts and does not wed,
She will pull his leg in court instead."

Beware of the grass widow when her eyes beam love and the shades are down low. She hypnotizes the reason, and the soul escapes the prison bars of discretion, and ".you float airily on golden clouds to rosy lands of pleasure and joy." Temporary bliss reigns supreme in the palace of love; but in the end it creates mournful memories, heartache, remorse of conscience, and a burning desire to "blot out the past."

*Affirmed.*